UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANE MATTHEW WISECUP,

                      Case No. No.  19-13717

          Plaintiff,             District Judge Matthew F. Leitman

v.                            Magistrate Judge R. Steven Whalen

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,

         Defendant.

_____ /

## REPORT AND RECOMMENDATION

Plaintiff Shane Matthew Wisecup brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's cessation of Disability Insurance Benefits ("DIB"). The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons set forth below, I recommend that Plaintiff's Motion for Summary Judgment  [ECF No. 10] be GRANTED and that Defendant's Motion for Summary Judgment [ECF No. 11] be DENIED, remanding this case for an award of continuing benefits.

-1-

## I.  PROCEDURAL HISTORY

On February 24, 2012, Plaintiff filed an application for DIB, alleging disability as of November 14, 2011  ECF No. 6-5, PageID.233 (Tr. 209).[1]  On May 16, 2012, Plaintiff was found to be disabled as of November 14, 2011 and awarded DIB (Tr. 18).  On September 19, 2016, the SSA found that Plaintiff was no longer disabled as of September 10, 2016 (Tr. 97).

After Plaintiff's initial challenge to the cessation of benefits was denied, he requested an administrative hearing, held on March 28, 2019 in Toledo, Ohio  (Tr. 38).  Administrative Law Judge ("ALJ") Patricia Carey presided.   Plaintiff, represented by attorney Shannon Lucas, testified (Tr. 44-74), as did Vocational Expert ("VE") James Lozer (Tr.  74-82).   On June 19, 2019, ALJ Carey determined that Plaintiff was not disabled as of September 10, 2016 (Tr. 18-31).

On October 22, 2019, the Appeals Council declined to review the ALJ's decision (Tr. 1-6).   Plaintiff filed his complaint in this Court on December 18, 2019.

## II.  BACKGROUND FACTS

Plaintiff, born  December 13, 1977, was 41 at the time of the ALJ's decision  (Tr. 31, 209).  He alleges continuing disability as a result of cancer treated by Whipple surgery,[2]

---

[1]References to the administrative transcript (ECF No. 6, 6-8) are henceforth cited by transcript page number (Tr. xx).

[2]

Mayoclinic.org states that "A Whipple procedure — also known as a pancreaticoduodenectomy — is a complex operation to remove the head of the pancreas, the first part of the small intestine (duodenum), the gallbladder and the bile duct." https://www.mayoclinic.org/tests-procedures/whipple-procedure/about/pac-20385054. (Last

abdominal fistula,[3] and associated pain and weakness (Tr. 248).

### A.  Plaintiff's Testimony

*The ALJ declined to look at current pictures taken of the abdominal fistula ("fistula") showing that the wound remained open at the time of the hearing, which Plaintiff's counsel offered to demonstrate "the size of the wound," "the fact it [was still] open," and that "it would impede [Plaintiff] from stretching and reaching and bending" (Tr. 42-43).  The ALJ stated that she would accept it if Plaintiff "ma[d]e it into a medical record by giving it to a doctor and having them send it to [her]" with an explanation "what it is" (Tr. 43).*

Plaintiff then offered the following testimony before the ALJ:

He lived with his twin brother in a rental home (Tr. 44-45).  He stood 5' 9" and weighed 125 pounds (Tr. 44).  He had attended a local college but had not received a degree (Tr. 45).  He also attended vocational school and received a certificate in AutoCAD design (Tr. 46).  Plaintiff held a valid driver's license but limited his driving to short distances due to his concern about becoming tired on longer trips (Tr. 46-47).  He was able to perform self

---

visited January 28, 2021).  "The goal of doing a Whipple procedure for cancer is to remove the tumor and prevent it from growing and spreading to other organs. This is the only treatment that can lead to prolonged survival and cure for most of these tumors." *Id.*

[3]
An "abdominal fistula," otherwise known as a gastrointestinal fistula, "is an abnormal opening in the stomach or intestines that allows the contents to leak. https://www.mountsinai.org/health-library/diseases-conditions/gastrointestinal-fistula#:~:t ext=A%20gastrointestinal%20fistula%20is%20an,skin%20are%20called%20enterocutan eous%20fistulas. (Last visited January 28, 2021).  "Leaks that go through to a part of the intestines are called entero-enteral fistulas. Leaks that go through to the skin are called enterocutaneous fistulas." *Id.*

care tasks (Tr. 47).

Before ceasing work two days before his November, 2011 cancer surgery, he worked as an outside plant tech for a telephone company (Tr. 47). His job required him to service customers, "troubleshoot," locate telephone cable, and work with road construction crews (Tr. 47). The job required him to lift up to 100 pounds and walk or stand frequently (Tr. 48).

Plaintiff continued to be disabled due the fistula and the accompanying symptom of painful digestion (Tr. 48-49). He had a wide abdominal scar from the Whipple procedure and beneath the scar, his abdomen had not healed since surgery (Tr. 49). He had a quarter to 50-cent size hole just below his sternum which was still open, noting that after eating, he could actually see the digestion process happening (Tr. 50). He required surgery to close the abdominal wall (Tr. 50). He had also had kidney stones removed on four separate occasions (Tr. 49). He had been told by his treating physician that the kidney stone problems should be "sorted out" and he would be required to gain weight before performing the abdominal repair surgery (Tr. 49-50). He noted that a wound specialist had recommended surgery at either the Cleveland Clinic or the Mayo Clinic (Tr. 49). He added that although he weighed close to 200 pounds before the cancer surgery, he was since unable to reach a weight of more than 127 pounds (Tr. 51). *The ALJ interjected that the records did not contain reference to an inoperable fistula* (Tr. 51-52). Plaintiff then continued, stating that he currently treated with an oncologist, a urologist, a primary doctor, and a pain management specialist (Tr. 53). He reported that he was currently taking suboxone (Tr. 53). *The ALJ interjected that she was*

-4-

*"confused" by Plaintiff's continued suboxone use, adding that "it's usually" used "to wean you off a narcotic regimen or some kind of opioid addiction"* (Tr. 53). Plaintiff resumed his testimony, noting that he was prescribed suboxone to get him off opioids and that he was currently "on the lowest dose possible," which he often split into even smaller doses (Tr. 54). None of his treating sources had recommended ceasing use of suboxone altogether, which he relied on to deal with "everyday pain" for the past two years until the fistula situation was resolved (Tr. 54). Plaintiff was not fully clear as to why the fistula condition remained unresolved (Tr. 55-56).

Plaintiff experienced chronic pain both after eating and voiding (Tr. 58). He experienced only partial relief by taking suboxone and reclining (Tr. 58-59). When asked if he wanted "to get off the suboxone," he replied that he did not "want to be on anything" (Tr. 59). He denied medication side effects but was "seriously depressed" (Tr. 60). He woke up "in tears" every morning due to pain and/or his physical problems (Tr. 60). He was unable to walk more than 10 minutes before requiring a rest (Tr. 61). On a typical day, he took his medicine, ate, and attempted to complete a light household chore (Tr. 62). He was able to grocery shop but required help bringing the bags into the house (Tr. 82). He took care of his therapy dog until she passed away one month before the hearing (Tr. 63). He did not have hobbies (Tr. 63). He did not have substance abuse problems but continued to smoke a pack of cigarettes every day (Tr. 64). He smoked marijuana once a day to try to help improve his appetite (Tr. 65). He opined that he would be unable to perform sedentary work due to pain

from sitting upright for any significant period (Tr. 66).

In response to questioning by his attorney, Plaintiff reported discomfort while both sitting upright and reclining but experienced some degree of relief with a reclining chair, adding that since the 2011 surgery, he had slept in a recliner every night (Tr. 68). He avoided any stretching or reaching due to concern about tearing the membrane over the fistula (Tr. 68). He weighed between 195 and 220 pounds before surgery but weighed 124.8 pounds (with clothes) at his most recent appointment (Tr. 67). He attempted to eat small, high protein meals to avoid chronic, painful gas (Tr. 69). He coped with after-meal pain and discomfort by napping (Tr. 69). Due to discomfort, he was unable to sleep for more than three hours at a time (Tr. 69). His discomfort resulting from chronic kidney stones also caused sleep disturbances (Tr. 70). His surgical scar was around two feet long and the open fistula was around two to three inches wide (Tr. 70).

### B. Medical Records

### 1. Records Predating May 16, 2012 Finding of Disability as of November 14, 2011[4]

In October, 2011, Plaintiff sought treatment for abdominal pain (Tr. 320). He stood 5' 10" and weighed 200 pounds (Tr. 321). Plaintiff was subsequently diagnosed with duodenal adenocarcinoma (Tr. 325). On November 2, 2011, Plaintiff was advised by an oncological team to undergo a Whipple procedure (Tr. 323). On November 14, 2011,

---

[4]Plaintiff's condition was not in dispute for this period. These records are included for background purposes only

Michael D. McPhee, M.D. performed Whipple procedure (pancreaticoduodenectomy with a feeding tube insertion) at Toledo Hospital (Tr. 325-327, 330).

Treating records from January, 2012 note that Plaintiff underwent a long post-surgical hospital stay after developing a pancreatic fistula, a thrombosis requiring an anticoagulatant, and a bile leak (Tr. 449). Treating records state that as of that month "the size of the wound" was "shrinking" (Tr. 450). The same month, Plaintiff reported digestive discomfort (Tr. 418, 420). In February, 2012, Plaintiff underwent chemotherapy (Tr. 511). Records by internist William J. Gray, M.D. note Plaintiff's report of digestive discomfort after attempting to reintroduce solid food to his diet (Tr. 389). Active conditions included "non-healing surgical wound" (Tr. 393). Plaintiff demonstrated a normal gait (Tr. 395). The same month, he told Dr. McPhee that he was feeling better (Tr. 455). A March, 2012 MRI of the brain was consistent with a subacute ischemia (aneurism) (Tr. 424). The same month, he reported to Dr. McPhee that he was able to "visit in the community in the last two weeks" but still required the use of a feeding tube (Tr. 462). A June, 2012 MRI showed significant improvement" from the March, 2012 MRI (Tr. 610-611). In August, 2012, Plaintiff weighed 112 pounds (Tr. 602). In October, 2014, Dr. McPhee noted that Plaintiff, then weighing 105 pounds, appeared emaciated (Tr. 647). He found that Plaintiff's ability to regain his health was exacerbated by his resident mother's symptoms of dementia (Tr. 647). Dr. McPhee opined that surgery to close the fistula could not be performed until Plaintiff gained weight (Tr. 647).

## 2.  Records Created From January, 2015 Forward

March, 2015 imaging studies, consistent with September, 2014 findings, showed multiple kidney stones (Tr. 577, 590).  November, 2015 oncology records by Rex Mowat, M.D. note Plaintiff's report of fatigue, generalized weakness, a fair appetite, and level "two to three" pain on a scale of one to ten (Tr. 502, 572).  Plaintiff weighed 119 pounds (Tr. 502). In February, 2016, Dr. Mowat noted that Plaintiff had been in remission since "late 2012 or early 2013" (Tr. 504).  He noted that the fistula was still present (Tr. 504).  He noted that Plaintiff was "very stable on pain medications" (Tr. 504).   Plaintiff required "port flush" maintenance every eight weeks (Tr. 504).  Dr. Mowat found that Plaintiff was unable to perform physically strenuous activity but could "carry out work of a light or sedentary nature, *e.g.* light house work, office work (Tr. 505).  He found further that Plaintiff remained "really quite well with no physical findings" (Tr. 506). Dr. Mowat's May, 2016 records note that Plaintiff's condition had "dramatically improved" over time but that the fistula remained unhealed (Tr. 518).  Plaintiff complained of abdominal pain and nausea (Tr. 519).  Dr. Mowat noted Plaintiff's report of "chronic pain from a chronic indwelling wound chronic abdominal surgery," noting that "clear[] clinical indications" supporting Plaintiff's report of "pain" (Tr. 519, 565).

June, 2016 records by pain specialist John W. Chatas, M.D. note Plaintiff's fistula "with some exposure of his intestines" (Tr. 526).  Plaintiff reported pain with eating described as "spasms, aching, sharp, stabbing, squeezing, punishing, penetrating, tearing, cramping,

exhausting and pressure" with "back spasms, weakness, temperature changes, sweating, loss of bowel and bladder control and changes in the way he walks" which was aggravated by "sneezing, exercise, coughing and bending forward" and was improved by "lying down, prescription pain medication, and sitting" (Tr. 526).   In July, 2016, Dr. McPhee noted that Plaintiff had "done remarkably well," citing imaging studies no signs of cancer (Tr. 561). He scheduled surgery for November, 2016 to repair the fistula with reconstruction of the abdominal wall (Tr. 562). He noted that Plaintiff "will be weaned off of his narcotics" before surgery (Tr. 643).   September, 2016 records note that Plaintiff continued to receive pain management treatment (Tr. 556).

In October, 2016, Dr. McPhee composed a letter on Plaintiff's behalf noting that Plaintiff remained disabled "due to a large ventral hernia and mucous fistula requiring daily wound care" (Tr. 637). He found that Plaintiff "cannot lift or strain due to ventral hernia and loss of domain" (Tr. 637). He noted that Plaintiff would be "scheduled for surgery short term" (Tr. 637).   In November, 2016, Dr. McPhee again noted that Plaintiff required abdominal repair surgery (Tr. 782). He noted that due to abdominal weakness, Plaintiff was unable to sit upright, stand, or walk for six hours a day and was limited in the ability to lift, pull, carry, and perform postural activity (Tr. 782, 784). On November 18, 2016, Dr. McPhee recorded that Plaintiff was off all narcotics and taking only Suboxone (Tr. 763). Plaintiff denied abdominal pain (Tr. 763). Dr. McPhee noted that the need for abdominal surgery prevented Plaintiff from working (Tr. 763). Dr. Mowat noted reports of abdominal pain,

fatigue, generalized weakness, poor appetite, and nausea (Tr. 653). Dr. Mowat noted that Plaintiff was ambulatory "and able to carry out work of a "light or sedentary nature" (Tr. 653). He prescribed antibiotics for pneumonia (Tr. 654). He encouraged Plaintiff to plan for reconstructing the abdominal wall "so he can even potentially go back to work, *etc*." (Tr. 654). Later the same month, Dr. McPhee recorded that Plaintiff was being treating with antibiotics for pneumonia and had experienced symptoms of kidney stones (Tr. 770). Dr. McPhee stated as follows: "plan is for him to [see] urology once pneumonia cleared. After renal stones are addressed he will contact our office for planning of surgery" (Tr. 770).

During a December 14, 2016 "surgical clearance" examination , Plaintiff reported that he ate a healthy diet but was still underweight (Tr. 661). He had finished his course of antibiotics but had a slight cough (Tr. 661). Active problems included chronic pain, diabetes melitus secondary to pancreatectomy, and anemia (Tr. 661). Plaintiff's BMI was 19.06 (Tr. 663). Plaintiff exhibited full muscle strength in all extremities (Tr. 664). Plaintiff was advised to quit smoking and gain weight (Tr. 664). Plaintiff was advised to obtain a chest x-ray to ensure pneumonia was resolved (Tr. 665). Plaintiff's "risk score" was tentatively deemed in the "low" range but the examiner was "awaiting specifics" (Tr. 665). Plaintiff expressed a desire to undergo surgery (Tr. 665).

March and April, 2017 imaging studies show kidney stones (Tr. 709, 711). Records from the same month note that Plaintiff weighed 105 pounds with a BMI of 15.97 (Tr. 714). May, 2017 records by Konda Mouli, M.D. state that Plaintiff needed a dressing for the fistula

(Tr. 720).  Plaintiff reported that he had been told that he needed to stop smoking before the fistula repair and that his surgeon wanted the kidney stone condition resolved before abdominal surgery (Tr. 721-722).  Plaintiff underwent shock wave lithotripsy for removal of the kidney stones the same month (Tr. 723).  Dr. Mowat's June, 2017 records note that Plaintiff's occupational status was still disabled (Tr. 700).  He again noted that Plaintiff was able to carry out "work of a light or sedentary nature" (Tr. 700).  September, 2017 imaging studies were again positive for kidney stones (Tr. 731).

In October, 2017, Nurse Practitioner Lisa A. Suing performed a yearly examination, noting that Plaintiff's treaters included a neurosurgeon, a metastatic cancer specialist, and a plastic surgeon for the proposed abdominal wall reconstruction (Tr. 745).  His active conditions included malnutrition, anemia, diabetes, and chronic pain (Tr. 745-746).  He reported that he no longer took a digestive enzyme because he "could not afford it" (Tr. 747).  In January, 2018, Dr. McPhee noted that Plaintiff's "abdominal wall has very little integrity and this prevents him from working.  He has had significant weight loss and finds it difficult to gain weight" (Tr. 771).   In May, 2018, Nurse Practitioner Heidi Nichols, working under the direction of Dr. Mowat, provided a thorough account of Plaintiff's surgical and treatment history, noting that while Plaintiff' "enjoyed a lengthy remission,"

> one can easily see [his] health and ability to perform physical activity due to his forever altered abdomen and pain issues is unrealistic.  Our office would strongly support ongoing disability in this case. Clearly he will never be able to perform work in length of shifts of anything that requires physical exertional, *i.e.* lifting any substantial weight of any kind, carrying, bending, squatting, etc" (Tr. 786).

-11-

In March, 2019, Nurse Practitioner Patricia Halbert-Raich performed a wound check, noting "moderate" drainage from the fistula (Tr. 792). Plaintiff was noted to be malnourished (Tr. 789). She noted that "short term goal" was wound compliance and long term, "wound closure" (Tr. 793). Plaintiff declined her "suggested referral" to Cleveland Clinic for fistula repair (Tr. 793). In April, 2019, Dr. McPhee noted that Plaintiff experienced malnutrition, loss of ventral wall integrity, a ventral hernia, and a centrally located fistula (Tr. 788). He stated as follows:

> Attempting surgical repair of this ventral hernia and correction of [] fistula would be a daunting proposition given the patient's current nutritional status as well as the complexity of surgery to correct these defects. . . . Risks outweigh benefits and therefore this has not been attempted (Tr. 788).

### 3. Non-Treating Records

In July, 2016, Saadat Abbasi, M.D. performed a non-examining review of Plaintiff's treating records subsequent to the original disability determination, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for up to six hours in an eight-hour workday; and push and pull without limitation (Tr. 93). He limited Plaintiff to occasional postural activity (Tr. 93).

In August, 2016, Anthony Gensterblum, Ph.D. performed a consultative psychological examination, noting Plaintiff's report of complications following cancer surgery of pancreatitis, a brain aneurysm and infections (Tr. 539). Plaintiff reported depression resulting from his physical condition characterized by crying and sporadic sleep (Tr. 539). He denied

mental health treatment (Tr. 529).  He reported the medication side effect of sleepiness (Tr. 539).  He currently used creon for digestion, a Fentanyl patch, Ocycodone, Lexapro for depression, Ritalin for drowsiness, and Phenergan as needed for nausea (Tr. 539).  He reported the current conditions of kidney stones, painful digestion, the fistula, and physical weakness due to dramatic weight loss (Tr. 540).  He currently stood 5' 9" and weighed 125 pounds (Tr. 540).

Dr. Gensterblum noted that Plaintiff appeared mildly depressed but fully oriented (Tr. 541).  He found that Plaintiff could manage "simple and repetitive tasks" (Tr. 542).  He noted that Plaintiff presented "signficant medical concerns" requiring evaluation (Tr. 542).  He gave Plaintiff a "poor" prognosis (Tr. 542).

A non-examining September, 2016 Psychiatric Review Technique found that Plaintiff's depression was non-severe (Tr. 671, 674, 683).  A Physical Residual Functional Capacity Assessment by Larry Jackson, M.D. states that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for up to six hours in an eight-hour workday; and push and pull without limitation (Tr. 688).  He limited Plaintiff to occasional postural activity (Tr. 689).  He based his findings on Dr. Mowat's treatment notes that Plaintiff could perform sedentary to light work (Tr. 693).

## C.  Vocational Testimony

Citing job titles found in the *Dictionary of Occupational Titles* ("*DOT*"),  the VE

classified Plaintiff's past work as a laborer as exertionally heavy and unskilled[5] (Tr. 75).

ALJ then posed the following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age, educational level, and work history:

> [T]he light exertional level. He can do light work except he can occasionally climb ramps and stairs. Never climb ladders, ropes, or scaffolds, and can occasionally balance, stoop, kneel, and crouch, but never crawl. Let's see. He can never work around hazards such as unprotected heights or moving dangerous mechanical parts. He can occasionally operate a motor vehicle and can occasionally work outdoors in the weather in conditions of humidity and wetness and conditions of extreme heat or cold and can occasionally work in conditions where vibrations are present. He is limited to frequent pushing and pulling with the bilateral upper extremities. He is also limited to performing simple, routine, and repetitive tasks, but not at production rate pace. For example, no assembly line work. He is limited to simple work-related decisions. He is limited to tolerating few changes in the work setting defined as routine job duties that remain static and are performed in a stable predictable work setting. Any necessary change changes need to occur infrequently and be adequately and easily explained. He is limited to a sit/stand option at the workstation each hour to change position for two minutes while remaining on task 90% of the time....Can the hypothetical individual perform the past job? (Tr. 77-78).

The VE testified that the above limitations precluded Plaintiff's past relevant work (Tr. 78).

He testified further that the need for a sit/stand option, coupled with the pacing restrictions

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

-14-

would preclude all light work (Tr. 78). The VE testified that if the sit/stand option were removed, the individual could perform the exertionally light, unskilled work of a custodian (620,000 positions in the national economy); office clerk (1,040,000); and usher/attendant/ticket taker (170,000) (Tr. 79). He testified that if the original hypothetical restrictions (including the sit/stand option) were applied to sedentary work, the individual could work as a surveillance system monitor (Tr. 17,000) and inspector (10,000) (Tr. 80). He stated that her testimony was consistent with the information found in the *DOT* and his own professional experience (Tr. 80). The VE testified that the need to recline during the work period, miss two work periods a month, or be off task 25 percent of the workday would be work preclusive (Tr. 80-81).

In response to questioning by Plaintiff's attorney, the VE testified that the need to lengthen the customary 15-minute morning and afternoon work breaks to 30 minutes would eliminate all competitive work (Tr. 82).

### D. The ALJ's Determination

ALJ Carey noted that at the time of the "comparison point decision" ("CPD") of May 16, 2012, Plaintiff was found disabled due to adenocarcinoma of the duodenum with metastatic disease, small intestine cancer; and brain abscess (Tr. 20). The ALJ found that as September 10, 2016, Plaintiff experienced the severe impairments of abdominal fistula, status post remote Whipple surgery in 2011, and history of stones, but that none of the impairments met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart

-15-

P, Appendix 1 (Tr. 22).  The ALJ found that as of September 10, 2016, Plaintiff experienced

only mild psychological limitation (Tr. 22).  The ALJ found that as of the same date, Plaintiff

had the Residual Functional Capacity ("RFC") for exertionally light work with the following

non-exertional limitations:

> He can occasionally climb ramps and stairs, never climb ladders ropes or
> scaffolds, and can occasionally balance, stoop, kneel, and crouch, but never
> crawl. He can never work around hazards, such as unprotected heights or
> moving dangerous mechanical parts, he can occasionally operate a motor
> vehicle, and can occasionally work outdoors in the weather, in conditions of
> humidity and wetness, in conditions of extreme heat or cold, and can
> occasionally work in conditions where vibrations are present. He is limited to
> frequent pushing and pulling with the bilateral upper extremities. He is also
> limited to performing simple, routine and repetitive tasks, but not at a
> production rate pace, for example, no assembly line work. He is limited to
> simple work-related decisions. He is limited to tolerating few changes in the
> work setting, defmed as routine job duties that remain static and are performed
> in a stable, predictable work setting. Any necessary changes need to occur
> infrequently, and be adequately and easily explained (Tr. 22-23).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the jobs of

custodian, office clerk, and usher/attendant (Tr. 30, 79).

        The ALJ rejected Plaintiff's allegations of continued disability (Tr. 26-29).   She

cited imaging studies showing no recurrence of cancer (Tr. 26).  She acknowledged the

existence of the fistula and compromised abdominal wall, but noted that it was "unclear as

to why" Plaintiff did not undergo abdominal surgery planned for December, 2016 (Tr. 26).

The ALJ cited March, 2019 records indicating that Plaintiff declined a surgery referral to

Cleveland Clinic (Tr. 26).  She found Dr. McPhee's October 12, 2016 opinion that Plaintiff

was unable to "lift or strain" "not very persuasive" (Tr. 27).  She found that while there was

-16-

"a surgical procedure that could resolve" the fistula "yet, the surgery was never done for reasons unknown from the record" (Tr. 28).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).   The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  *Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g).   "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.  1986)(*en banc*).  Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key*

*v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)). However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV. FRAMEWORK FOR CESSATION OF BENEFITS CLAIMS

In determining whether an individual continues to be disabled, the ALJ employs a eight-step sequential analysis in regard to DIB claims *See* 20 C.F.R. § 404.1594. At Step One in a DIB claim, the ALJ determines whether the individual is engaging in substantial gainful activity. A finding that the claimant is performing substantial gainful activity results in a finding of non-disability. At Step Two, the ALJ considers whether the individual had an impairment or combination of impairments which meets or equals the severity of a listed impairment. If the ALJ finds such impairment(s), the inquiry continues. At Step Three, the ALJ determines whether there has been medical improvement. At Step Four, the ALJ considers whether the medical improvement relates to the individual's ability to perform work. At Step Five, the ALJ determines if there has been no medical improvement or the medical improvement is not related to the individual's ability to perform work. At Step Six, the ALJ determines whether the individual's current impairments are severe. The absence of a severe impairment directs a non-disability finding. At Step Seven, the ALJ determines

-18-

whether the claimant's abilities allow him to perform his past relevant work. A finding that he can perform such work results in a non-disability finding. At Step Eight, the ALJ determines whether the individual can perform other work in light of his or her age, education, work experience and RFC. A finding that he is capable of performing other work results in a non-disability finding.

In contrast to an initial disability determination, "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Kennedy v. Astrue,* 247 Fed.Appx. 761, 765, 2007 WL 2669153, *4 (6th Cir. September 7, 2007)(*citing Griego v. Sullivan,* 940 F.2d 942, 944 (5th Cir.1991)). In a cessation of benefits case, "the central question is whether the claimant's medical impairments have improved to the point where [s/he] is able to perform substantial gainful activity." *Kennedy* at 764; 42 U.S.C. § 423(f)(1). A "medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement must be supported by an improvement "in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.*; *Kennedy* at 765.

## V. ANALYSIS

Plaintiff makes two arguments for remand. First, he faults the ALJ's finding that the record was "unclear" as to why his fistula repair surgery was not performed in December, 2016. ECF No.12, PageID.883. He notes that contrary to the ALJ's finding, the medical

transcript is replete with explanations as to why the surgery was delayed.  Second, he contends that although the ALJ cited the regulation forming the basis of the "treating physician rule," she erroneously applied another standard in assessing the medical opinions.  *Id.* at 885 (*citing* 20 C.F.R. § 1527(c)).

### A.  The Delayed Fistula Repair

At the hearing, the ALJ asked Plaintiff why he had not undergone fistula repair surgery anytime within the eight years since the Whipple procedure (Tr. 50).  Plaintiff responded that he had been told that his kidney stone situation and his inability to gain weight delayed the surgery, adding that he had lost over 100 pounds after the time of the Whipple procedure (Tr. 50-51).  The ALJ said she was "still not really clear why" the fistula repair had been delayed, adding she had not seen anything "anywhere in any record" that the kidney stones treatment delayed the fistula repair (Tr. 52-53).  Plaintiff speculated that his treating oncologist, Dr. McPhee, was "scared" to undertake the abdominal surgery (Tr. 52).  After querying Plaintiff about his Suboxone therapy, the ALJ revisited the delayed fistula repair, stating that "somehow your medical care has been stalled and I don't understand that" (Tr. 56).

In the administrative opinion, the ALJ found "the record is unclear as to why" the scheduled fistula repair surgery was not performed (Tr. 26), then later, "[t]he surgery was never performed for reasons that are unclear in the record (Tr. 27), and finally, "[t]he undersigned cannot ignore that there is a surgical procedure that could resolve the claimant's problems; yet, the surgery was never done for reasons unknown from the record" (Tr. 28).

The ALJ's conclusion that the record was "unclear" is problematic for multiple reasons. First, Plaintiff testified that he believed that surgery had not been performed due to kidney stones and his chronic, longstanding inability to reach a normal weight (Tr. 50-51).  As to the medical transcript evidence, the November and December, 2016 records by Dr. McPhee note that the prerequisites to undergoing the planned surgery included (1) ensuring that Plaintiff no longer experienced symptoms of pneumonia and, (2) obtaining treatment for kidney stones (Tr. 770).  The records from the same month note a diagnosis of pneumonia (Tr. 654).  A pre-surgical examination record from the same period also notes that Plaintiff was advised to gain weight (Tr. 664).  May, 2017 urologist's records state that Plaintiff, then weighing 105 pounds, was advised to  resolve the kidney stone situation before undergoing the repair surgery (Tr. 721-722).  Notably, Plaintiff's kidney stone problems and failure to gain weight had not resolved by the time of hearing.  If this were not enough, Dr. McPhee stated in April, 2019 that the fistula repair had not been performed due to Plaintiff's "nutritional status as well as the complexity of [the] surgery" (Tr. 788).  He concluded that the "risks outweigh benefits" (Tr. 788).

If the ALJ was still "unclear" about why Plaintiff had not undergone the fistula repair, it was within her discretion to reach out to Plaintiff's treating sources and/or order a consultative examination under 20 C.F.R. § 404.1520b(b)(ALJ "may recontact" a treating source or "ask you to undergo a consultative examination" where the evidence is insufficient to make a determination). Alternatively, assuming that there was enough evidence to make a

determination, the  inference that Plaintiff deliberately refrained from surgery to extend his

disability or exaggerated his symptoms is wholly unsupported by the record.

More generally, the ALJ's additional reasons for discounting Plaintiff's report of

disabling limitation are based on a myopic, if not outright distorted reading of the record.  The

ALJ found that Dr. McPhee's opinion that the risks of surgery outweighed the benefits was

undermined by the fact that Dr. McPhee had not explained the "risks" involved in the

contemplated surgery and that Plaintiff was given a referral to Cleveland Clinic for the fistula

repair from the same month (Tr. 27).  However, Dr. McPhee's risk/benefit conclusion is

directly preceded by his opinion that Plaintiff's underweight status cautioned against

undergoing aggressive surgery (Tr. 788).  The ALJ's rejection of Dr. McPhee's opinion is also

based on the weak assumption that the Cleveland Clinic or anyone else would have

recommended surgery after examining Plaintiff.  This conclusion is wholly unsupported by the

records.

The ALJ also observed that Plaintiff had declined the referral to the Cleveland Clinic

(Tr. 27).  Although the ALJ appears to discount Plaintiff's allegations of limitation based on

his failure to follow up with Cleveland Clinic, she makes no effort to ascertain Plaintiff's

reasons for refusing the referral, although the record contains two compelling reasons for his

doing so: (1). Plaintiff (as testified to at the hearing) had lost his health insurance (Tr. 71) and

(2) Dr. McPhee, his long-term treating oncologist, opined the same month that the risks of

surgery outweighed the benefits.[6] Under SSR 16-3p, 2017 WL 5180304 at *9 (October 25, 2017), the SSA "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." Among the reasons to be considered are that the "individual may not be able to afford treatment and may not have access to free or low-cost medical services" and, "[a] medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual." Both of these factors are applicable here. But there is no indication the ALJ considered either in rejecting the allegations of continued disability.

The ALJ's reliance on Dr. Mowat's "finding" that Plaintiff could perform sedentary or light work adopted by the non-examining creates independent problems (Tr. 27, 505, 519, 653). The treating records show that Dr. Mowat's findings are based on the Eastern Cooperative Oncology Group ("ECOG") performance status scale which ranges from "0" (fully active) to "5" (dead). https://ecog-acrin.org/resources/ecog-performance-status. (Last visited February 8, 2021). Plaintiff's score of "1" suggesting that he was capable of "work of a light or sedentary nature," was apparently based on factors such as extremity strength and a normal gait, but would not address his claims of disability based on the fistula, weakness, underweight status, or kidney stones. The assessment appears to be based on Plaintiff's

---

[6]Indeed, October, 2017 treating records state that Plaintiff discontinued the use of digestive enzymes because he was no longer able to afford them (Tr. 747)

-23-

oncological status (in remission) rather than his actually work-related abilities.

Even assuming the citation to the ECOG assessments did not constitute error, the ALJ failed to acknowledge Dr. Mowat's later clarification of his position, made through a nurse practitioner working under his direction:[7]   In May, 2018, the Nurse Practitioner stated that "one can easily see [Plaintiff's] health and ability to perform physical activity due to his forever altered abdomen and pain issues is unrealistic" (Tr. 786).   The Nurse Practitioner continued: "Our office would strongly support ongoing disability in this case. Clearly he will never be able to perform work in length of shifts of anything that requires physical exertional, *i.e.* lifting any substantial weight of any kind, carrying, bending, squatting, etc" (Tr. 786).

The ALJ's failure to acknowledge this May, 2018 opinion creates additional problems. The ALJ gave some persuasive value to Dr. Jackson's May, 2017 non-examining conclusion that Plaintiff was capable of a range of exertionally light work (Tr. 26-27).   However, Dr. Jackson states that he based his assessment on Dr. Mowat's ECOG "light work" finding, and as of May, 2017, could not have reviewed the 2018 opinion authored by Dr Mowat's staff member (Tr. 693).   In this case, the reliance on the older findings without consideration of a newer one (particularly one clarifying earlier statements) constitutes error. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009); *see also Brooks v. Comm'r Soc. Sec.* 531

---

[7]   In addition to Dr. Mowat's treating records stating that NP Nichols was working under his direction (Tr. 509), the Toledo Clinic website indicates that Dr. Mowat and NP Nichols were part of the facility's hemotology/oncology team. https://www.toledoclinic.com/?s=mowat; https://www.toledoclinic.com/?s=nichols. (Last visited February 8, 2021).

Fed.Appx. 636, 642 (August 6, 2013)(reversing where non-examining source's earlier opinion was adopted over more recent examining findings); *Hamblin v. Apfel*, 2001 WL 345798, *2 (6th Cir. March 26, 2001)(affirming ALJ's rejection of a treating physician's "outdated" opinion on basis consultive physician had performed more recent appraisal with contradicting findings).  In the instance that "an ALJ relies on a non-examining source who 'did not have the opportunity to review' later submitted medical evidence, especially when that evidence 'reflects ongoing treatment,'" the reviewing court "generally require[s] 'some indication that the ALJ at least considered these new facts before giving greater weight to an opinion that is not based on a review of a complete case record.'" *Brooks* at 642 (*quoting Blakley*, 581 F.3d at 409)(internal citations and punctuation omitted).  The ALJ did not reference the May, 2018 opinion, much less assign it a persuasive value.

### B.  The Treating Physician Rule

Here, Plaintiff notes that while the ALJ cited the regulation giving presumptively controlling weight to a treating physician's opinion, she erroneously applied a different standard to the analysis of the opinion evidence.  ECF No.12, PageID.885.

For claims filed before March 27, 2017, the opinion of a treating physician is accorded controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "not inconsistent with the other substantial evidence." *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) 20 C.F.R. § 404.1527(c)(2); SSR 96–2p, 1996 WL 374188, at *5 (1996).

However in contrast to the earlier claims where § 404.1527 is applied, for claims made on or after March 27, 2017, the ALJ will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520c; 416.920c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources"). The factors to be considered in evaluating medical opinions include supportability and consistency with the record as a whole; relationship with the claimant; length of the treatment relationship; frequency of examinations; purpose and extent of the treating relationship; whether the source has examined the claimant; specialization; and any other factors that support or undermine the medical opinion. §§ 404.1520c(c). ALJs must articulate the "most important factors of supportability and consistency" of the medical opinions but "are not required to[ ] explain" the consideration given to the remaining factors." §§ 404.1520c(b); 416.920c(b).

Plaintiff is correct that the ALJ cited the older regulation requiring deference to a treating physician's opinion (Tr. 23) but applied the newer standard in assessing the treating source opinions by later stating that she would "not defer or give any specific evidentiary weight, including controlling weight, to any . . . medical opinion(s), including those from [Plaintiff's] medical sources" (Tr. 26). The ALJ's subsequent discussion of the medical opinions includes the degree to which she found each "persuasive," indicating that she applied § 1520c in analyzing the medical opinion evidence (Tr. 27-28).

-26-

Defendant responds that while both Plaintiff's application for benefits and cessation of benefits determination occurred prior to March 27, 2017, the newer standard applies to cessation of benefit cases. *Defendant's Brief,* ECF No. 11, PageID.867. "[T]he Commissioner's Hearings, Appeals, and Litigation Law Manual ("HALLEX") directs ALJs to apply the March 27, 2017 regulations to all continuing disability reviews ("CDR")." *Id.* (*citing* HALLEX § I-5-3-30.IV.E).   Defendant also relies on *Mudge v Saul*, 2019 WL 3412616, at *5 (E.D. Mo. July 29, 2019)("While generally these new rules apply to only those claims filed on or after March 27, 2017, they also apply to all continuing disability reviews, with certain exceptions not applicable here").   Under HALLEX § I-5-3-30.IV.E the older regulation is applied  if "all of the following apply:" (1) "This is the first CDR for the claim(s) after March 27, 2017," (2) "There is no medical improvement related to the ability to work," and, (3). [a]ll full medical determination(s) made in the claim(s) under review were made using the prior rules.

The ALJ's analysis appears to apply § 1520c rather than § 1527(c), and the single citation to § 1527 appears to be nothing more than a scrivener's error.  However,  conditions (1) and (3) required for application of the prior rules appear to apply here: This is Plaintiff's first CDR and his disability claim was originally adjudicated under the prior rules.  While under the second factor, the ALJ found a "medical improvement," it appears to beg the ultimate question of whether Plaintiff continued to experience disability.

 Nonetheless, the Court need not determine whether the prior or current rules apply,

given that the ALJ's analysis fell well short of even the newer, less restrictive rules for considering treating opinions. The ALJ failed to discuss, much less assign a persuasive value to the May, 2018 opinion of NP Nichols (working under the guidance of Dr. Mowat) that Plaintiff was not capable of full-time work at any exertional level (Tr. 786). The apparent failure to review, much less discuss the disability opinion is particularly specious, considering the ALJ's heavy reliance Dr. Mowat's earlier statement that from an *oncological* perspective, Plaintiff could perform some degree of sedentary or light activity. Even assuming that Dr. Mowat's earlier comments could plausibly support the non-disability finding, NP Nichol's May, 2018 statement that Plaintiff was not capable of working at any exertional level leaves no doubt as to Dr. Mowat's actual position. The ALJ's reliance on Dr. Mowat's earlier comments without acknowledgment of his later clarification amounts to a distortion of the record. Further, while Drs. Mowat and McPhee, both oncologists, often described Plaintiff's progress in superlatives, these comments, read in context, refer to Plaintiff's continued remission from a usually terminal condition, and cannot be interpreted as opinions of non-disability. It is uncontested that Plaintiff continued to experience the post-surgical complications of an open hole in his intestine (seeping with even moderate activity), painful digestion, weakness, anemia, and the inability to reach a normal weight.

The final question is whether to remand for further proceedings or an award of benefits. The ALJ's support for the non-disability determination is based on an incomplete and erroneous reading of the record. To recap: (1) the ALJ's finding that the record was "unclear"

as to the delay in fistula repair (used as a basis to discredit Plaintiff's claims) is not supported by the record,  (2) the ALJ improperly discredited Plaintiff's decline of the Cleveland Clinic surgical referral without considering that he had apparently lost his health insurance by the time of the referral and that his treating oncologist had advised against surgery, (3) the ALJ relied on a non-examining assessment that did not have benefit of a later-clarified treating opinion (4) the ALJ ignored the May, 2018 opinion of disability,  (5) the ALJ incorrectly stated that Dr. McPhee had failed to describe the risks involved in the fistula repair, (6)  the ALJ erroneously found Dr. McPhee's November 1, 2016 assessment of Plaintiff's work-related abilities was "undated" (Tr. 28, 781),  (7) she discounted Dr McPhee's assessment based on Dr Mowat's earlier, but later corrected findings (Tr. 28), and (8) the ALJ's citation to the "positive" but irrelevant findings (*i e.,* fortuitous remission and a normal gait)  rather than the obvious and ongoing bases for ongoing disability (open, painful, abdominal wound, his emaciated condition, and chronic kidney stones). In summary, the Court is unable to discern any support for the ALJ's finding that Plaintiff's disability ended on September 10, 2016.

As such, because "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits," *Faucher v. Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), this case should be remanded for an award of continuing benefits.

## VI.   CONCLUSION

For these reasons, I recommend that Plaintiff's Motion for Summary Judgment [ECF No. 10] be GRANTED and that Defendant's Motion for Summary Judgment [ECF No. 11] be DENIED, remanding this case for an award of benefits.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

-30-

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen
R. Steven Whalen
United States Magistrate Judge

Dated: February 10, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was sent to parties of record on February 10, 2021 electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager